**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-1667
_____

DONALD D. PARKELL,

Appellant

v.

CARL DANBERG, Commissioner of Prisons, in his
individual and official capacities; WARDEN PERRY
PHELPS, in his individual and official capacities; DEPUTY
WARDEN DAVID PIERCE, in his individual and official
capacities; MAYOR MICHAEL COSTELLO, in his
individual and official capacities; CAPTAIN M. RISPOLI, in
his official and individual capacities; LIEUTENANT JOHN
DOE, in his individual capacity; BRIAN KUHNER, in his
individual capacity; MS. WEST, in her individual capacity;
MAINTENENCE SUPERVISOR JOHN DOE, in his official
and individual capacities; CORRECTIONAL MEDICAL
SERVICES; BETTY BRYANT, in her individual capacity;
DR. BAEDER, in his individual capacity; DEPUTY
WARDEN CHRISTOPHER KLEIN, in his individual and
official capacities; CAPTAIN JOHN DOE, in his official and
individual capacities; CHRIS DAMRON, in her individual
capacity; CORRECT CARE SERVICE LLC; MENTAL
HEALTH MANAGEMENT; ALLEN HARRIS; JOHN DOE,
Medical Director for C.M.S.; JOHN DOE, Medical Director
for C.C.S.

_____

On Appeal from the United States District Court for the
District of Delaware
(D.C. Civil No. 10-cv-00412)
District Judge:  Hon. Sue L. Robinson

_____

Argued January 20, 2016

Before:  FISHER, CHAGARES, and COWEN, <u>Circuit Judges</u>

(Filed:  August 17, 2016)

Suzanne M. Bradley (Argued)
Brendan M. Walsh (Argued)
Pashman Stein
21 Main Street
Court Plaza South, Suite 200
Hackensack, NJ 07601
        Attorneys for Appellant

Joseph C. Handlon
Devera B. Scott (Argued)
Office of Attorney General of Delaware
820 North French Street, 6th Floor
Wilmington, DE 19801
        Attorneys for Appellees Danberg, Phelps, Pierce,
Costello, Rispoli, and Klein

Chad J. Toms (Argued)
Whiteford, Taylor & Preston
405 North King Street
The Renaissance Centre, Suite 500
Wilmington, DE 19801
        Attorney for Appellees Correctional Medical Services,
Bryant, and Damron

Daniel A. Griffith (Argued)
Scott G. Wilcox
Whiteford, Taylor & Preston
405 North King Street
The Renaissance Centre, Suite 500
Wilmington, DE 19801
        Attorneys for Appellee Correct Care Service LLC

_____

OPINION

_____

CHAGARES, Circuit Judge.

Plaintiff Donald Parkell is a Delaware state prisoner who claims that state officials deprived him of his rights under the Fourth, Eighth, and Fourteenth Amendments by subjecting him to unreasonable thrice-daily visual body-cavity searches and harsh conditions and by depriving him of adequate medical care. He seeks damages and injunctive relief under 42 U.S.C. § 1983. The United States District Court for the District of Delaware granted summary judgment to the defendants, and Parkell timely appealed. For the reasons that follow, we will affirm in part and reverse in part. We will reverse only as to Parkell's claim under the Fourth Amendment for prospective injunctive relief.[1]

I.[2]

Parkell was an inmate at James T. Vaughn Correctional Center ("VCC") in Smyrna, Delaware, during the relevant time period, which began on January 1, 2009, when Parkell slipped and fell at VCC and was injured. He was transported to Kent General Hospital in Dover, Delaware, and examined. His chest, spine, head, and right hand and wrist were x-rayed with normal results, except for loss of normal lumbar lordosis possibly due to muscular strain. He was then discharged to the prison infirmary, where he was housed for approximately a week. Parkell was placed under 24-hour supervision and prescribed pain medication and exercises. He received this treatment through a small slot

---

[1] Parkell's attorneys are appearing pro bono. We express our gratitude to those attorneys for accepting this matter pro bono and for the quality of their representation of their client. Lawyers who act pro bono fulfill the highest service that members of the bar can offer to indigent parties and to the legal profession.

[2] Much of Parkell's version of events is supported solely by his own statements in verified complaints and other court filings. Because those documents were signed under penalty of perjury in accordance with 28 U.S.C. § 1746, we consider them as equivalent to statements in an affidavit. See United States v. 225 Cartons, More or Less of an Article or Drug, 871 F.2d 409, 414 n.4 (3d Cir. 1989).

in the cell door, approximately three feet off the ground, and was told that medical staff were not permitted to enter his cell because of his high-security status as a resident of the Secured Housing Unit ("SHU"). He complained of intense pain, but medical staff refused to treat his elbow because his chart did not mention an elbow injury. Staff refused to give him ice for his injury, again citing his high-security status. His room was unheated, and he complained. But prison officials told him that he would not be moved and had to endure the cold because of his SHU status; they did not provide any extra linens or clothing.

After his week in the infirmary, Parkell was returned to the SHU. He submitted a request for "sick call" for his elbow, which was swollen, discolored, and painful. On or about January 12, he was brought to Betty Bryant, a nurse employed at VCC. According to Parkell, Bryant never truly examined the elbow and "would not allow [Parkell] to talk while in her presence" or to "describe his injury and symptoms." Appendix ("App.") 96, 178. She characterized his condition as mere "edema" (i.e., swelling) even though it was a "massive infection," and accused Parkell of "run[ning] game" to get Vicodin, adding that she would not bother the doctor because he would not "fall for it" either. Id. She said that she would order an x-ray herself and that if Parkell needed aspirin he could buy it from the commissary. She then told officers to "get him out of here." App. 96. Bryant, on the other hand, claims in her affidavit that she examined his elbow, saw no sign of infection, advised him to avoid sleeping on his arm, and ordered follow-up x-rays. She argues that that is corroborated by a January 12, 2009 physician order implementing her own x-ray order, along with the x-ray reports, dated January 16, showing normal results. Parkell's elbow got worse "[o]ver the next few days," and the wound ultimately opened and "squirted" pus. App. 96. A doctor arrived to perform emergency surgery and prescribe antibiotics and pain medication. Testing revealed that Parkell had had a staph infection. When Parkell later complained about tingling and numbness, a doctor performed nerve testing and told Parkell that there might be "branching damage." App. 97.

Several months later, on November 4, 2009, Parkell was moved to an isolation cell in a unit known as "C-Building" because of disciplinary misconduct, where he remained for twelve days. Parkell, like other inmates in isolation in C-Building, was locked in a stripped-down cell, was given only a t-shirt, boxer briefs, and socks to wear, was not permitted to keep rags, towels, or rolls of toilet paper in his cell, and was provided with soap and other hygienic items only during thrice-weekly showers. Parkell was also denied exercise, never permitted to leave the cell except during the five-minute thrice-weekly showers, and required to eat meals in his cell without any opportunity to wash his hands first. Three times per day officers "strip searche[d]" him, visually inspecting his anus and genitals while he "was forced to squat naked and cough loudly." App. 99. Parkell attests that he had "no contact with any other human beings" while in isolation, though he says that "[n]urses would arrive daily to pass out medication." App. 98-99. When nurses arrived to pass out medication, Parkell showed them the infection, but they said it was against policy for medical staff to visit inmates in isolation. His elbow again deteriorated and released pus.

There is some question as to precisely how long it took for Parkell to receive treatment for his elbow injury while in C-Building. Parkell's account provides little detail. He claims that his elbow was not evaluated until "[a] few days" into his isolation period, when a mental health worker who visited him finally advocated for him. App. 98, 180. He was then taken to the infirmary and given antibiotics and pain medication, and nurses were ordered to clean the wound. But "Interdisciplinary Progress Notes" dated November 5, 2009 (Parkell's second day in C-Building), which appear to be prepared by a nurse (although it is unclear who prepared them), note the swollen elbow and pus drainage and suggest that the nurse took a culture, cleaned and dressed the wound, and called the on-call doctor, who ordered medication. App. 959-60. Records of physician orders suggest that the medication was to begin on November 5, 2009, although the order was not actually signed by the doctor until November 10. Further progress notes dated November 9 note that Parkell was "referred . . . to a provider" on November 6 but "[w]as never seen" and that "[t]he lab report[ed] never

5

receiving specimen." App. 962. The preparer of those notes describes cleaning and dressing the wound, "reculturing" it, and "refer[ring] to provider again — tomorrow." Id. The report of the culture result lists the collection date as November 9. Records suggest that further treatment was ordered on November 10 and Parkell's elbow was x-rayed on November 13. Parkell agrees that his elbow was operated on a second time on December 4, 2009.

The final series of events concerns Parkell's physical therapy for his elbow, which was ordered (presumably by his treating doctor, but the complaint is unclear) to begin in August 2009. By March 2010, Parkell had received only three physical therapy sessions. His therapist informed him that he had ligament damage, most likely requiring an MRI, and that the long delay between his injury and the start of therapy had caused him to heal incorrectly. He was taken for an MRI around June 1, 2010, and then referred to an orthopedic specialist who recommended surgery. Two months later, there had been no "progression in treatment," so Parkell filed a grievance. App. 196. He was initially told in response to the grievance that there was no record of the surgery recommendation, but the recommendation was later uncovered. The surgery was performed on March 9, 2011. He then spent two weeks in the infirmary, where he was denied any time outside his cell, even to shower, and required to receive medication and therapy through the small slot in the door, which caused Parkell pain.

On March 21, 2011, his orthopedic surgeon, Dr. DuShuttle, prescribed four Vicodin per day for pain, but upon his return to VCC, Parkell was given only two per day. One day Parkell received only one pill, and on two occasions he received no pills for the day; he was told that there was a supply shortage. During a follow-up visit on April 13, 2011, Dr. DuShuttle ordered more pain medication and physical therapy three times per week. But Parkell received therapy only once per week, and even then only about two-thirds of the weeks.

Proceeding pro se, Parkell filed a lawsuit against Correctional Medical Services, Inc. ("CMS") and Correct Care Services, LLC ("CCS"), which were contractors

providing medical care to the Delaware Department of Correction ("DOC");[3] Nurse Bryant in her individual capacity; Chris Damron (another nurse employed by CMS at VCC) in her individual capacity — these four will be referred to collectively as the "Medical Defendants" — DOC Commissioner Carl Danberg in his individual and official capacities; Warden Perry Phelps in his individual and official capacities; Deputy Warden David Pierce (a supervisor of security matters) in his individual and official capacities; Deputy Warden Christopher Klein (a supervisor of medical issues) in his individual and official capacities; Captain M. Rispoli (a shift commander) in his individual and official capacities; and Major Michael Costello (a supervisor of security matters) in his individual and official capacities — these defendants will be referred to collectively as the "State Defendants."[4]

Parkell alleged that his Eighth Amendment rights were violated because he was provided inadequate healthcare and subjected to cruel conditions of confinement. Commissioner Danberg was accused of renewing CMS's contract with the DOC despite knowing of the inadequate care being provided, signing a contract with CCS without doing due diligence, and implementing policies and practices that denied adequate care. The remaining DOC officials (Phelps, Pieces, Klein, Rispoli, and Costello), as well as CMS and CCS, were accused of implementing policies or practices that deprived Parkell of adequate healthcare and exposed him to cruel conditions. Bryant allegedly violated Parkell's Eighth Amendment rights by refusing to examine his infected arm and provide needed treatment, and Damron allegedly violated his rights by maliciously twisting and yanking his arm through a door slot, causing immense pain and exacerbating his injury.

---

[3] CMS provided medical services to the DOC from July 1, 2005, through June 30, 2010, at which point CCS replaced CMS.

[4] The complaints named additional defendants who were dismissed by the District Court before the summary judgment ruling, but those dismissals are not being appealed.

Parkell also alleged that Danberg, Phelps, Pierce, Costello, Rispoli, Klein, CMS, and CCS violated his due process rights under the Fourteenth Amendment by refusing to treat him and subjecting him to conditions significantly worse than other inmates with similar circumstances had to endure.

The District Court granted summary judgment to the defendants on all claims, concluding that: (1) Parkell could not pursue damages from DOC officials in their official capacities because of the Eleventh Amendment, and any claim for prospective relief was rendered moot when Parkell was moved to a different correctional facility; (2) his medical-needs Eighth Amendment claim failed because any deficiencies in his medical care did not rise to the level of deliberate indifference to his needs; (3) his conditions-of-confinement Eighth Amendment claim failed because the conditions did not constitute a denial of basic human needs, and the defendants were not personally involved in creating the conditions; and (4) his due process clam failed because the conditions of his confinement did not constitute atypical and significant hardship in comparison to general prison conditions. Parkell timely appealed.

## II.

The District Court exercised jurisdiction under 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291.

We apply a plenary standard of review to a district court order granting summary judgment. Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 643 (3d Cir. 2015). "Summary judgment is appropriate when 'the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)). An issue of fact is material and genuine if it "affects the outcome of the suit under the governing law and could lead a reasonable jury to return a verdict in favor of the nonmoving party." Id. (quotation and alteration marks omitted). The party seeking summary judgment "has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact."

Id. In order to avoid summary judgment, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." Id. "Reviewing the record as a whole, we will draw all reasonable inferences in favor of the non-moving party and will not weigh the evidence or make credibility determinations." Armour v. Cty. of Beaver, PA, 271 F.3d 417, 420 (3d Cir. 2001) (quotation marks omitted).

### III.

On appeal, with the aid of pro bono counsel, Parkell has clarified and narrowed his claims somewhat. He argues that: (1) the State Defendants violated his Fourth Amendment and procedural due process rights by subjecting him to thrice-daily visual body-cavity searches while he was in isolation in C-Building; (2) his demand for prospective injunctive relief is not moot because he has returned to VCC; (3) the State Defendants violated his Eighth Amendment rights by subjecting him to harsh conditions in both C-Building and the infirmary; (4) Nurse Bryant violated his Eighth Amendment rights through her deliberate indifference to his serious elbow injury;[5] (5) CMS and CCS violated his Eighth Amendment rights by turning a blind eye to practices that deprived him of the full amount of pain medication and physical therapy that had been prescribed; and (6) the District Court abused its discretion in declining to appoint pro bono counsel.

As set forth in detail below, we conclude that all of Parkell's claims lack sufficient evidence to submit to a fact-finder, except for his claim that the thrice-daily visual body-cavity searches in C-Building were unreasonable and violated the Fourth Amendment, for which Parkell could potentially receive prospective injunctive relief. We will therefore reverse summary judgment as to Parkell's claim against the State Defendants for prospective injunctive relief under the Fourth Amendment and remand it to the District Court for

---

[5] Although Nurse Damron is also named in the appeal, Parkell makes no argument as to why the District Court erred in granting summary judgment in favor of Damron.

further proceedings consistent with this opinion. In all other respects, we will affirm the District Court's grant of summary judgment in favor of the defendants.

## A.

Parkell's claim under the Fourth Amendment pertains to the thrice-daily visual body-cavity searches conducted in C-Building.[6] We agree with Parkell that the State Defendants were not entitled to summary judgment on the question of whether the searches violated the Fourth Amendment. The record before us could support a finding in Parkell's favor on that issue. The same record could not, however, support a finding that any of the State Defendants were personally involved in the Fourth Amendment violation and liable for money damages. As to injunctive relief to prevent future Fourth Amendment violations, we are unable to determine from the record whether the issue is still live and justiciable; that question must be answered by the District Court on remand.

### 1.

#### a.

As an initial matter, we must address the applicability of the Fourth Amendment to Parkell's claim. Following the

---

[6] The Fourteenth Amendment extends Fourth Amendment protections to searches and seizures by state officials. Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 147 (3d Cir. 2005).

Parkell's Fourth Amendment claim was not clearly pled or argued while he was pro se. Although courts liberally construe pro se pleadings, unrepresented litigants are not relieved from the rules of procedure and the requirements of substantive law. McNeil v. United States, 508 U.S. 106, 113 (1993); Faretta v. California, 422 U.S. 806, 834 n.46 (1975). Pro bono counsel now representing Parkell have focused his Fourth Amendment claim considerably, noting this legal precept. The State Defendants have raised no objection to our consideration of this refocused claim, and, accordingly, we will consider counsel's Fourth Amendment arguments as well as the State Defendants' opposition to those arguments.

approach taken by the Supreme Court in <u>Bell v. Wolfish</u>, 441 U.S. 520, 558 (1979), we have previously assumed that the Fourth Amendment applies to strip searches of inmates without so holding. <u>See</u> <u>Florence v. Bd. of Chosen Freeholders of Cty. of Burlington</u>, 621 F.3d 296, 306 (3d Cir. 2010) ("<u>Florence I</u>"), <u>aff'd</u>, 132 S. Ct. 1510 (2012).[7] In <u>Bell</u>, the Court analyzed a Fourth Amendment claim under the "<u>assum[ption]</u> for present purposes that inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility." <u>Bell</u>, 441 U.S. at 545, 558 (emphasis added).

The Court subsequently held in <u>Hudson v. Palmer</u>, 468 U.S. 517 (1984), that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." <u>Id.</u> at 526. But we do not read <u>Hudson</u> to foreclose a Fourth Amendment claim arising from an unreasonable search of an inmate's <u>body</u>. <u>Hudson</u> involved a "shakedown" search of a prisoner's locker and cell, during which his property was destroyed, and the Court considered whether "[t]he recognition of privacy rights for prisoners in their individual <u>cells</u>" could "be reconciled with the concept of incarceration and the needs and objectives of penal institutions." <u>Id.</u> (emphasis added); <u>see also id.</u> at 538 (O'Connor, J., concurring) ("The fact of arrest and incarceration abates all legitimate Fourth Amendment privacy and possessory interests in personal effects, and therefore all searches and seizures of the contents of an inmate's cell are reasonable." (citations omitted)). The "shakedown" searches at issue in <u>Hudson</u> were categorically different from the bodily searches described by Parkell. Despite some of the broad language in the opinion, <u>Hudson</u> does not directly address the issue before us.

---

[7] Although <u>Florence I</u> involved strip searches of pretrial detainees, we noted that "[t]he <u>Bell</u> analysis applies equally to all individuals [properly assigned to the facility's general population] — whether they be convicted inmates, indicted pretrial detainees, contemnors, material witnesses, or arrestees awaiting preliminary hearings before a magistrate." 621 F.3d at 308 n.7.

11

The Court's opinion in <u>Hudson</u> does, however, provide the framework for our analysis. "The applicability of the Fourth Amendment turns on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." <u>Id.</u> at 525 (quotation marks omitted). In other words, we must decide whether an inmate's expectation of bodily privacy "is the kind of expectation that society is prepared to recognize as reasonable." <u>Id.</u> (same). We hold that it is and that the Fourth Amendment therefore grants inmates a limited right of bodily privacy, subject to reasonable intrusions necessitated by the prison setting.

We conclude that a right to privacy in one's own body, unlike a right to maintain private spaces for possessions, is not fundamentally inconsistent with imprisonment and is so fundamental that society would recognize it as reasonable even in the prison context. Our conclusion "necessarily entails a balancing of interests." <u>Id.</u> at 527. Like the Court in <u>Hudson</u>, we recognize that "[t]he curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of institutional needs and objectives of prison facilities, chief among which is internal security," but also that prisoners must be "accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." <u>Id.</u> at 523, 524 (quotation marks and citation omitted).

We also note that most of our sister Courts of Appeals have concluded that the Fourth Amendment has some applicability to bodily searches in prison.[8]  And,

---

[8] <u>See, e.g.</u>, <u>Sanchez v. Pereira-Castillo</u>, 590 F.3d 31, 42 n.5 (1st Cir. 2009) (listing cases) ("Although the Supreme Court in <u>Hudson</u> 'foreclosed any [F]ourth [A]mendment challenge to the search of a prison cell,' this court, like those in most other circuits, 'has recognized a qualitative difference between property searches and searches of a prisoner's person.'") (quoting <u>Dunn v. White</u>, 880 F.2d 1188, 1191 (10th Cir. 1989)); <u>Stoudemire v. Mich. Dep't of Corr.</u>, 705 F.3d 560, 572 n.2 (6th Cir. 2013); <u>Bull v. City & Cty. of S.F.</u>, 595 F.3d 964, 974-75 (9th Cir. 2010) (en banc); <u>Levine v. Roebuck</u>, 550 F.3d 684, 687 (8th Cir. 2008); <u>Boxer X v.</u>

notwithstanding <u>Hudson</u>, the Supreme Court has recently applied the Fourth Amendment reasonableness framework from <u>Bell</u> in upholding the constitutionality of strip searches of pretrial detainees. <u>Florence v. Bd. of Chosen Freeholders of Cty. of Burlington</u>, 132 S. Ct. 1510, 1516 (2012) ("<u>Florence II</u>").

b.

Our conclusion that the Fourth Amendment applies to bodily searches in prison does not, however, speak to the contours of prisoners' Fourth Amendment rights. They are very narrow. The application of the Fourth Amendment once again requires us to balance interests. "The test of reasonableness under the Fourth Amendment . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." <u>Bell</u>, 441 U.S. at 559. "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." <u>Id.</u> Inmate search policies are constitutional if they "str[ike] a reasonable balance between inmate privacy and the needs of the institutions." <u>Florence II</u>, 132 S. Ct. at 1523.

In balancing those interests in the prison context, we must give considerable weight to the "place in which [the search] is conducted" — prisons being "places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct," <u>Hudson</u>, 468 U.S. at 526 — and considerable deference to "the justification for initiating it." <u>Bell</u>, 441 U.S. at 559. "[C]orrectional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." <u>Florence II</u>, 132 S. Ct. at 1517. A regulation "impinging on an inmate's constitutional rights must be upheld if it is reasonably related to legitimate penological interests." <u>Id.</u> at 1515 (quotation marks omitted). We recognize that "[t]he task of determining whether a policy

---

<u>Harris</u>, 437 F.3d 1107, 1110 (11th Cir. 2006); <u>Nicholas v. Goord</u>, 430 F.3d 652, 658 (2d Cir. 2005); <u>Elliott v. Lynn</u>, 38 F.3d 188, 191 n.3 (5th Cir. 1994).

is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials." Id. at 1517 (quotation marks omitted). Unless there is "substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters." Id. (quotation marks omitted).

In Bell, the Supreme Court upheld a program under which inmates were "required to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution." 441 U.S. at 558. After "[b]alancing the significant and legitimate security interests of the institution against the privacy interests of the inmates," the Court concluded that "visual body-cavity inspections . . . [could] be conducted on less than probable cause." Id. at 560. Specifically, the Court cited possible "[s]muggling of money, drugs, weapons, and other contraband . . . by concealing them in body cavities." Id. at 559.

But Bell does not categorically uphold all bodily searches in prisons. The facts of our case differ materially from those of Bell. In Bell, the searches occurred after visitation sessions involving in-person contact with outsiders. In our case, the searches occur thrice daily, regardless of how much contact, if any, an isolated inmate has had with other people. We therefore must conduct our own balancing of the interests in this case, taking into account "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id. at 559.

The "particular intrusion" at issue here is a requirement that three times every day inmates remove their clothing and submit their anal and genital regions to visual inspection while they squat and cough, whether or not they have had any contact with others. The State Defendants do not dispute that this is the policy in C-Building. The parties use the term "strip search" — as do many courts — but "strip search," although an "umbrella term" in some contexts, "generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities," whereas

"[a] 'visual body cavity search' extends to visual inspection of the anal and genital areas" and "[a] 'manual body cavity search' includes some degree of touching or probing of body cavities." Blackburn v. Snow, 771 F.2d 556, 561 n.3 (1st Cir. 1985). Our analysis concerns only the specific type of "strip" search at issue in this case — that is, visual body-cavity searches, like those in Bell — and not other more intrusive or less intrusive types of bodily searches, which entail a different balancing of interests.

Turning to the balancing of interests, we do not understand the State Defendants to be disputing that the searches are a significant intrusion into bodily privacy. The Court in Bell expressed no doubt that visual body-cavity searches constituted a significant intrusion. 441 U.S. at 558, 560 ("Admittedly, this practice instinctively gives us the most pause. . . . We do not underestimate the degree to which these searches may invade the personal privacy of inmates."). And we have recognized that even strip searches "less intrusive than . . . visual body-cavity searches" are an "extreme intrusion on privacy." Florence I, 621 F.3d at 307.

Regarding the countervailing security interests, we again emphasize that our review is deferential and that the State Defendants' burden is light, for the reasons already given. Nonetheless, on the record before us, we conclude that the particular search policy enforced in C-Building is not reasonably related to VCC's legitimate interests in detecting and deterring contraband, particularly given the significant intrusiveness of the thrice-daily visual body-cavity searches.

The State Defendants are unable to articulate a single plausible theory as to how inmates in isolation in C-Building would have thrice-daily opportunities to smuggle in contraband from outside their cells or use unsupervised time in their locked cells to transform a harmless object into something dangerous. And we cannot imagine a plausible scenario ourselves. It is undisputed that inmates in isolation in C-Building live in stripped-down cells in which they wear only t-shirts, boxer briefs, and socks, are not permitted to keep rags, towels, or rolls of toilet paper, and are provided with soap and other hygienic items only during their thrice-weekly showers. And according to Parkell's version of

15

events, the credibility of which we do not doubt in the context of summary judgment, he left his isolation cell only three times per week for brief showers and had no human contact while in isolation, except for daily visits from nurses for the limited purpose of dispensing medication (along with, of course, the thrice-daily visual body-cavity searches themselves).  He therefore had few, if any, opportunities to obtain contraband — and certainly not three opportunities per day — which distinguishes this case from the searches in <u>Bell</u> that took place after visitations involving in-person contact.

Parkell's daily visits from nurses and thrice-weekly visits to the showers cannot justify the quantity of searches. It may well be reasonable for VCC to conduct visual body-cavity searches of C-Building inmates after each such visit.[9] But at most, that would justify ten searches per week, not twenty-one.   And although the State Defendants have suggested that Parkell's contact with medical personnel while in isolation was more extensive, they conceded at oral argument that the record does not evidence thrice-daily interactions.   In any event, in the context of summary judgment, we construe the record in Parkell's favor, crediting the portions that describe only once-daily visits from nurses dispensing medication.

The fact that Parkell, like others in C-Building, was being punished for disciplinary violations does not alter our conclusion.  Arguably, it does magnify the State Defendants' security interest, insofar as inmates who have already broken prison rules may be more likely to seek and utilize dangerous contraband.   But the reasonable relationship to the search policy is still missing.   When dangerous inmates are completely isolated in C-Building, it is the isolation that prevents the smuggling of contraband.   Thrice-daily bodily searches have little, if any, value in that context unless the period of complete isolation has somehow been interrupted.

---

[9] The record is unclear as to whether those visits actually presented any opportunity for contraband to be smuggled.   Indeed, Parkell describes his interactions with nurses as taking place through the narrow pass-through slot in his cell door, under the supervision of prison officials.

We emphasize the narrowness of our holding. We do not underestimate inmates' potential zeal and creativity for finding ways to smuggle or create dangerous contraband if given any opportunity to do so. In Bell, the probability that an inmate would obtain contraband during a visitation was low but still sufficient to justify the search policy. But here, the probability is vanishingly small that an inmate locked in a stripped-down isolation cell in C-Building, once searched, could then obtain contraband during a subsequent eight-hour period involving no human contact. As such, the intrusive thrice-daily searches are not a reasonable means of advancing VCC's legitimate interest in detecting and deterring contraband.

We do not mean to suggest that VCC must point to a history of C-Building inmates who successfully smuggled contraband into their isolation cells. As in Bell, the lack of history may be "a testament to the effectiveness of this search technique as a deterrent." Bell, 441 U.S. at 559. It is the virtual impossibility of smuggling contraband into C-Building, rather than the absence of a history of smuggling, that is relevant here. Deterrence is a legitimate concern but a far less weighty concern when the conduct to be deterred is already virtually impossible.

Nor does our holding concern individualized suspicion. Individualized suspicion that a C-Building inmate had somehow obtained contraband would, of course, still justify a search of that particular inmate. This case concerns the implementation of general, routine search policies, for which individualized suspicion is not required. As we have previously noted, "Bell did not require individualized suspicion for each inmate searched; it assessed the facial constitutionality of the policy as a whole, as applied to all inmates." Florence I, 621 F.3d at 308. "The absence of an individualized suspicion requirement in Bell is consistent with the Fourth Amendment doctrine of special needs searches." Id. at 308 n.8; see also Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 619-20 (1989) (categorizing Bell as a "special needs" search case); Hudson, 468 U.S. at 538 (O'Connor, J., concurring) (noting that in certain contexts, such as the one considered in Bell, "the Court has rejected the case-by-case approach to the 'reasonableness'

17

inquiry in favor of an approach that determines the reasonableness of contested practices in a categorical fashion"). "Under the 'special needs' analysis, the government need not show probable cause or even individualized suspicion for its search" and instead "must prove that its search meets a general test of 'reasonableness.'" Wilcher v. City of Wilmington, 139 F.3d 366, 373-74 (3d Cir. 1998).

Routine, suspicionless inmate search policies may sweep quite broadly and still be reasonable. In Florence II, the Supreme Court declined to require jails to adopt a policy of exempting new detainees "who ha[d] not been arrested for a serious crime or for any offense involving a weapon or drugs" from the blanket strip searches conducted before detainees were committed to the general population. Florence II, 132 S. Ct. at 1520. The Court held that it was reasonable for jails to conclude that such an exemption was "unworkable" because "the seriousness of an offense is a poor predictor of who has contraband" and "it would be difficult in practice to determine whether individual detainees fall within the proposed exemption." Id. The Court in Florence II recognized that narrowly targeted search policies are generally not required in prisons and jails because they tend to be incompatible with the setting. They are often difficult, if not impossible, to implement without an unacceptable risk of false negatives (instances in which dangerous contraband is missed because an inmate is incorrectly classified as low-risk and subjected to less thorough searches). Thus, it is usually reasonable for prisons to favor more broadly drawn search policies.

But VCC's search policy sweeps too broadly with insufficient justification. VCC's security interests are not reasonably advanced by a blanket policy of frequently and intrusively searching inmates who have previously been thoroughly searched and held in a stripped-down isolation cell without human contact ever since.[10] Unlike the search

---

[10] In similar cases, our sister Courts of Appeals have allowed inmates to pursue Fourth Amendment claims after being subjected to bodily searches when they had had no opportunity to obtain contraband. See Turkmen v. Hasty, 789

policy in <u>Florence II</u>, VCC's search policy in C-Building is not a blanket policy that has been reasonably selected over a more targeted policy that would be unworkable. In <u>Florence</u>

---

F.3d 218, 261 n.44 (2d Cir. 2015) ("[C]onsistent with <u>Hodges</u>, Plaintiffs have plausibly alleged that they were strip searched when there was no opportunity to acquire contraband, including in instances where they were shackled and under escort, or were never permitted to leave their cells."); <u>Franklin v. Lockhart</u>, 769 F.2d 509, 510-11 (8th Cir. 1985) ("[T]he evidence shows that Franklin was strip searched twice a day while he was confined to his cell with access to only staff-issued meals and tissue. We cannot say that defendants' mere declaration that these searches occurred 'according to policy' to maintain security and prevent the flow of contraband clearly establishes defendants' right to judgment on this claim. Though defendants' objectives may indeed have been legitimate, . . . [t]he search must be reasonable in its scope and its manner of execution."); <u>Hodges v. Stanley</u>, 712 F.2d 34, 35-36 (2d Cir. 1983) ("The second search took place shortly after the first, and Hodges had been under continuous escort. Under these circumstances it seems clear that there was no possibility that Hodges could have obtained and concealed contraband. Thus the second search appears to have been unnecessary. We therefore cannot say that Hodges has failed to state a constitutional claim."); <u>Bono v. Saxbe</u>, 620 F.2d 609, 617 (7th Cir. 1980) ("Guards handcuff the inmates before they leave the Control Unit and escort them to the visitation area. The inmates are separated from the visitors by plexiglass, and guards observe these visits. We do not believe that the rationale announced in <u>Bell v. Wolfish</u>, supra, justifies these strip searches. Thus, the Supreme Court in <u>Wolfish</u> relied on the possibility of contraband being brought into the prison during contact visits to justify the use of strip searches. Those contact visits were not closely supervised by guards. <u>Wolfish</u> should not be extended to the facts of this case without a showing that there is some risk that contraband will be smuggled into Marion during non-contact, supervised visits, or that some other risk within the prison will be presented. Since defendants do not discuss the searches in their brief, we are not in a position to dispose of the issue and, therefore, the district court should consider it on remand.").

II, it was plausible that <u>any</u> new detainee might be carrying contraband from the outside world into the institution, and distinguishing between high-risk detainees and low-risk detainees would have been costly and error-prone.[11]  But in our case, the only generalized risk that C-Building inmates will obtain contraband arises from their limited contact with the world outside their stripped-down cells.  Tying routine visual body-cavity searches to instances of outside contact, rather than an unyielding thrice-daily schedule, would seem to be a simple and categorical policy to implement, especially given that prison officials have the ability to closely regulate isolated inmates' limited contact with the world outside their cells; the State Defendants have given us no reason to conclude otherwise.  And, of course, those officials are free to search C-Building inmates individually suspected of possessing contraband.

Thus, construing the record in Parkell's favor, we conclude that the search policy in its present form is an "exaggerated . . . response to [security] considerations" and thus violates the Fourth Amendment.  <u>Florence II</u>, 132 S. Ct. at 1517.  The State Defendants were therefore not entitled to summary judgment on Parkell's Fourth Amendment claim.

2.

Having determined that Parkell presents a triable Fourth Amendment claim, we next consider whether Parkell may pursue money damages from the State Defendants, who did not themselves conduct the visual body-cavity searches but may have had supervisory involvement.   A plaintiff "cannot predicate liability on her § 1983 claims on a <u>respondeat superior</u> basis."   <u>Chavarriaga v. N.J. Dep't of Corr.</u>, 806 F.3d 210, 227 (3d Cir. 2015).  We have recognized that "there are two theories of supervisory liability, one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be

---

[11]  In their concurring opinions in <u>Florence II</u>, Chief Justice Roberts and Justice Alito (members of the five-person majority) both emphasized the narrowness of the Court's holding.  <u>See</u> 132 S. Ct. at 1523-25.

liable if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations." Santiago v. Warminster Twp., 629 F.3d 121, 129 n.5 (3d Cir. 2010) (quotation and alteration marks omitted). Parkell argues that both theories apply here but has not supported his argument with evidence. Although it is certainly plausible that some of the named defendants had supervisory involvement in the searches, Parkell has not come forward with enough evidence for a reasonable fact-finder to conclude that they did.

As to Commissioner Danberg, Parkell points only to Danberg's generalized admission that he "is familiar with the policies of the Department of Correction" and "approved the DOC policies." App. 775. "[T]o establish a claim against a policymaker under § 1983 a plaintiff must allege and prove that the official established or enforced policies and practices directly causing the constitutional violation." Chavarriaga, 806 F.3d at 223. The problem with Parkell's attempt to hold Danberg liable is that he has not pointed to any evidence of where the search policy, practice, or custom came from. Danberg does not acknowledge any involvement in establishing or enforcing any specific policies (much less specific search policies in C-Building or at VCC), or even any awareness that the searches were occurring. And although the defendants concede that inmates in isolation were routinely subjected to thrice-daily visual body-cavity searches, it is unclear whether this was in accordance with official DOC policy endorsed by Danberg, a policy limited to VCC, or even just an informal practice or custom. To presume that the search practices arose from Danberg's policies merely because of his position as commissioner is to rely on respondeat superior.

Likewise, there is no evidence linking Warden Phelps to the establishment of the search policy, practice, or custom in C-Building. Unlike Danberg, however, Phelps has admitted knowledge that C-Building inmates were strip searched three times per day. If Phelps knew about the search practices in C-Building and had authority to change them but chose not to, that might constitute supervisory involvement in violating Parkell's rights. Santiago, 629 F.3d at 129 n.5

(supervisors liable if, "as the persons in charge, [they] had knowledge of and acquiesced in their subordinates' violations"). But there is no evidence that Phelps had such authority. Parkell has merely asserted in a brief that "Phelps, as Warden, w[as] responsible for ensuring . . . compli[ance] with the acknowledged strip search policy," without pointing us to any facts or legal authorities to support the assertion. Reply Br. 21. We have no evidence addressing whether C-Building had dominion over its own search practices, followed orders from the warden on the matter, or was held to policies delivered directly from the DOC. And we do not believe that an official is "enforcing," "maintaining," or "acquiescing in" a policy merely because the official passively permits his subordinates to implement a policy that was set by someone else and is beyond the official's authority to change. Knowing nothing more than Phelps's title as warden, a factfinder could not reasonably conclude that Phelps was a "person[ ] in charge" of search practices in C-Building and thereby "acquiesced" in the practice of thrice-daily visual body-cavity searches. See Santiago, 629 F.3d at 129 n.5.

Like Phelps, Captain Rispoli admits awareness of the search practices in C-Building, but there is no evidence of Rispoli's role in establishing or enforcing the practices, and it is unclear whether Rispoli had any authority to intercede. Rispoli admits to being the "unit commander for the maximum security units, including the Secured Housing Unit ("SHU"), which consists of Buildings 17, 18, and 19." App. 414. He then describes Building 18 and C-Building as separate "units" and says, "The shift commander for the maximum security housing units is responsible for assigning inmates to an isolation unit. When I am the shift commander, I make those assignments. . . . I am responsible for the inmates assigned to Building 18 isolation. But I am familiar with both the Building 18 isolation unit and the C-Building isolation unit." App. 415. The most natural reading of those statements is that Rispoli commanded isolation units other than C-Building. But even if there were ambiguity to be resolved in Parkell's favor, there would still be insufficient evidence that Rispoli's position gave him control over search policies such that he could be charged with "acquiescence" in their enforcement.

The evidence of the remaining State Defendants' involvement is even weaker. Parkell points only to Deputy Warden Pierce's admission that he is "familiar with DOC policies" and Major Costello's admission that he is "aware of security matters in the areas of the institution in which he [is] assigned." Reply Br. 22 (citing App. 781-82). There is no evidence of Deputy Warden Klein's knowledge of the searches.

We therefore affirm the District Court insofar as it granted summary judgment in favor of the State Defendants in relation to any Fourth Amendment claim for money damages.

3.

Our conclusion that the State Defendants lacked personal involvement in past constitutional violations does not preclude Parkell from obtaining prospective injunctive relief for ongoing violations. Hartmann v. Cal. Dep't of Corr. & Rehab., 707 F.3d 1114, 1127 (9th Cir. 2013); Gonzalez v. Feinerman, 663 F.3d 311, 315 (7th Cir. 2011) (per curiam); see also Argueta v. U.S. Immigration & Customs Enforcement, 643 F.3d 60, 70, 77 (3d Cir. 2011) ("Plaintiffs failed to allege a plausible claim to relief on the basis of the supervisors' 'knowledge and acquiescence' or any other similar theory of liability . . . [but] are still free to pursue their official capacity claims for injunctive relief against any further intimidation or unlawful entry into their home."); Koehl v. Dalsheim, 85 F.3d 86, 88-89 (2d Cir. 1996) (similar). In seeking a prospective injunction against the implementation of an unconstitutional state policy, Parkell is required to name an official or officials "who can appropriately respond to injunctive relief." Hartmann, 707 F.3d at 1127; see also Gonzalez, 663 F.3d at 315 (proper defendant is one "responsible for ensuring that any injunctive relief is carried out"). He has done so. Although we leave it to the District Court to determine which defendants would appropriately be named in an injunction should Parkell prevail on his claim, at the very least Commissioner Danberg or his successor could appropriately respond to injunctive relief.

The State Defendants, however, argue that the issue of injunctive relief is moot. They do not deny that Parkell is currently incarcerated at VCC, nor do they contend that the search practices in the isolation units have changed.[12] Rather, they argue that the issue is moot because Parkell's Fourth Amendment claim arose from his temporary confinement in C-Building and he is no longer confined there. We agree with the State Defendants but also believe that an exception to the mootness doctrine could potentially apply. Parkell argues that, in light of his current incarceration at VCC and the likelihood of a return to isolation units in the future, a Fourth Amendment violation is "capable of repetition yet evading review," which makes injunctive relief appropriate. Reply Br. 26. He requests that we at least remand the issue to the District Court to consider in the first instance with the aid of further factual development.

The "capable of repetition yet evading review" doctrine is an exception to mootness that applies when "(1) the challenged action is, in its duration, too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." United Indus., Serv., Transp., Prof'l & Gov't Workers of N. Am. Seafarers Int'l Union ex rel. Bason v. Gov't of V.I., 767 F.3d 193, 212 (3d Cir. 2014) (quotation marks omitted). The exception is "narrow and available only in exceptional situations." Rendell v. Rumsfeld, 484 F.3d 236, 241 (3d Cir. 2007) (quotation marks omitted).

The capable-of-repetition exception is inapplicable when a previously incarcerated plaintiff has been completely released from the system through expiration of a sentence or

---

[12] We note that, even if VCC had voluntarily changed its search practices since the lawsuit was filed, that alone would not necessarily moot Parkell's claim for injunctive relief. DeJohn v. Temple Univ., 537 F.3d 301, 310 (3d Cir. 2008) ("[V]oluntary cessation does not moot a case or controversy unless subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." (quotation and alteration marks omitted)).

acquittal upon retrial, because it would be mere "conjecture" to conclude that the plaintiff might be reincarcerated and subjected to the same conditions again.  See, e.g., Doe v. Delie, 257 F.3d 309, 313-14 (3d Cir. 2001) (plaintiff acquitted upon retrial).  A more difficult and fact-intensive question is raised, however, when the plaintiff is still connected to the system.  In Micklus v. Carlson, 632 F.2d 227 (3d Cir. 1980), we held that there was a "realistic possibility of reincarceration" for a parolee "because of the low standard for reincarceration."  Id. at 232-33 (noting that the parole commission "cannot be totally arbitrary, [but] may nevertheless revoke [his] parole status if at any time . . . [it] is of the opinion that [he] will be benefited by further treatment in an institution or other facility" (quotation marks omitted)).  But in Abdul-Akbar v. Watson, 4 F.3d 195 (3d Cir. 1993), a prisoner had been released from a maximum security unit three-and-a-half years into his eight-year sentence, and the District Court applied the capable-of-repetition exception, citing "the procedures through which inmates may be classified into and out of maximum security."  Abdul-Akbar v. Watson, 775 F. Supp. 735, 755 (D. Del. 1991).  When the case was appealed, we rejected the capable-of-repetition theory and held that the District Court had improperly "speculat[ed]" that the prisoner could be returned to a maximum security unit.  4 F.3d at 197, 206-07.

Parkell's point is well-taken that, as a general matter, confinement of inmates in isolation units is hardly unusual, which we have acknowledged in other contexts.  Cf. Torres v. Fauver, 292 F.3d 141, 150 (3d Cir. 2002) ("[D]isciplinary detention and administrative segregation [are] the sort[s] of confinement that inmates should reasonably anticipate receiving at some point in their incarceration . . . .").  But Parkell must present more than generalities; he must establish a reasonable expectation that he, specifically, will again be subjected to the unconstitutional search practices carried out in VCC's isolation units.  See OSHA Data/CIH, Inc. v. U.S. Dep't of Labor, 220 F.3d 153, 168 (3d Cir. 2000) (placing the burden on the plaintiff to show that the capable-of-repetition exception applied).  We reject Parkell's last-minute effort to meet that burden by claiming to have returned to isolation for five days in June 2015, which is not reflected in the record and is merely asserted in his reply brief.

We are also mindful, however, that the issue was understandably never explored in the District Court,[13] where discovery could have occurred and factual findings could have been made regarding crucial issues, such as Parkell's history of confinement in isolation units, the frequency with which and conditions under which VCC officials send inmates to isolation units, and exactly how much discretion officials have to do so. We will therefore leave it for the District Court to determine on remand whether Parkell's request for injunctive relief in relation to the visual body-cavity searches remains a live issue under the capable-of-repetition exception to mootness. See, e.g., Williams v. Anderson, 959 F.2d 1411, 1417 (7th Cir. 1992) (capable-of-repetition finding was "fact-intensive" and not well-developed on the record and therefore "best left to the district court").

## B.

Parkell also challenges the visual body-cavity searches as violating his right to procedural due process. He concedes that he was given notice and a hearing concerning his placement in isolation. His claim is that, in addition to that process, he was also owed notice about the visual body-cavity searches specifically and a hearing on the matter. We disagree and will therefore affirm the District Court's grant of summary judgment on this claim.

A prisoner holds a liberty interest triggering due process if either (1) "state statutes and regulations create a liberty interest in freedom from restraint that imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," or (2) "severe changes in conditions of confinement amount to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing." Evans v. Sec'y Pa. Dep't of Corr., 645

---

[13] The District Court was under the impression that Parkell was no longer at VCC, but Parkell had in fact been returned to VCC three weeks before the District Court's summary judgment ruling. The District Court was not informed of Parkell's return.

F.3d 650, 663 (3d Cir. 2011) (quotation marks omitted). Parkell argues only the "severe changes" theory.

Examples of "severe changes in in conditions of confinement" include "forced administration of antipsychotic medication, or involuntary transfer to a mental hospital, or, for a prisoner not convicted of a sex offense, forced participation in sex-offender therapy." Id. at 665 (citations omitted). Such changes result in punishment that is "qualitatively different from the punishment characteristically suffered by a person convicted of crime, and ha[s] stigmatizing consequences." Renchenski v. Williams, 622 F.3d 315, 326 (3d Cir. 2010) (quotation marks omitted).

We cannot say that routine visual body-cavity searches are "qualitatively different from the punishment characteristically suffered by a person convicted of a crime," that they impose "stigmatizing consequences" akin to being labeled psychotic or a sex offender, id., or that they otherwise constitute "severe changes in conditions of confinement amount[ing] to a grievous loss," Evans, 645 F.3d at 663. Parkell therefore lacks a constitutionally protected liberty interest under a "severe changes" theory, and his procedural due process claim fails.

## C.

Parkell raises two Eighth Amendment claims: (1) that the State Defendants subjected him to harsh conditions of confinement and (2) that the Medical Defendants ignored his medical needs. Because there is insufficient evidence of deliberate indifference as to either claim, we will affirm the District Court's grant of summary judgment on these claims.

## 1.

A claim regarding prison conditions "does not rise to the level of an Eighth Amendment violation unless: (1) the prison official deprived the prisoner of the minimal civilized measure of life's necessities; and (2) the prison official acted with deliberate indifference in doing so, thereby exposing the inmate to a substantial risk of serious damage to her future health." Chavarriaga, 806 F.3d at 226. We need not

determine whether Parkell was deprived of "the minimal civilized measure of life's necessities" because the record would not permit a reasonable factfinder to conclude that the State Defendants were deliberately indifferent. See id. We will therefore affirm the District Court's grant of summary judgment in the State Defendants' favor as to Parkell's Eighth Amendment conditions-of-confinement claim.

In the Eighth Amendment context, "deliberate indifference" is "a subjective standard of liability consistent with recklessness as that term is defined in criminal law." Nicini v. Morra, 212 F.3d 798, 811 (3d Cir. 2000) (en banc). A prison official is deliberately indifferent if the official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Chavarriaga, 806 F.3d at 229 (quotation marks omitted). A plaintiff "may demonstrate deliberate indifference by showing that the risk of harm was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past such that the defendants must have known about the risk." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 259 (3d Cir. 2010) (quotation marks omitted). But the plaintiff must show that the officials were "aware of facts from which the inference could be drawn that a substantial risk of harm exists, and that they also drew the inference." Id. (quotation and alteration marks omitted). "It is not enough merely to find that a reasonable person would have known, or that the defendant should have known . . . ." Farmer v. Brennan, 511 U.S. 825, 843 n.8 (1994).

Parkell attests that during his first stay in the infirmary in January 2009, he was held in a cell without working heat, and during his second stay in March 2011, he was permitted no exercise and no showers for over two weeks. He also attests that during his time in C-Building isolation in November 2009, he was subjected to thrice-daily visual body-cavity searches and denied exercise and access to basic hygienic materials. And he claims to have been denied access to medical personnel during his time in both the infirmary and C-Building, insofar as the nurses who visited refused to examine him, citing a policy against entering the cells.

As evidence of the State Defendants' deliberate indifference, Parkell points to little more than their "admissions" of awareness of certain DOC policies. That evidence fails because most of the policies of which the defendants admit to have knowledge differ in subtle but important ways from the conditions that Parkell claims to have experienced. Thus, although the defendants admit knowledge of restrictive policies, those policies do not amount to cruel and unusual punishment. And to the extent that Parkell may have experienced even harsher conditions beyond what those policies call for, there is no evidence that the defendants were aware of that.

In his affidavit, Pierce claims that there are no VCC policies preventing medical staff from entering the cells of maximum-security inmates housed in the infirmary, as long as the staffer is accompanied by two other officers; no policies preventing maximum-security inmates housed in the infirmary from showering; and no policies preventing an inmate from receiving extra blankets or clothing if the heat is malfunctioning. He admits that ice and recreation time are not ordinarily provided to maximum-security inmates housed in the infirmary but says that both would be provided if directed by a doctor. He also admits that the infirmary had intermittent heating problems in 2009, but never for extended periods. He adds that it was practice to provide extra blankets when heating problems arose, and certainly not practice to deny extra blankets to an inmate who requested them. In his affidavit, Rispoli claims that inmates in isolation in C-Building are taken out of their cells for one hour three times per week, during which time they can shower and recreate. According to him, inmates in C-Building are permitted medical treatment, which they can request, and are checked at every shift for medical needs. In his discovery responses, Phelps claims that inmates in isolation are seen by medical staff every eight hours and can be taken out of isolation for treatment if needed. He says that soap and hygienic items are provided during shower and recreation time, and while inmates may not store toilet paper in their cells, it is provided upon request.

The defendants do concede that thrice-daily visual-body cavity searches occurred for inmates in isolation, but

such searches do not constitute cruel and unusual punishment unless they are "undertaken maliciously or for the purposes of sexually abusing an inmate." Crawford v. Cuomo, 796 F.3d 252, 258 (2d Cir. 2015); see also King v. McCarty, 781 F.3d 889, 897 (7th Cir. 2015) (per curiam) ("A prisoner states a claim under the Eighth Amendment when he plausibly alleges that the strip-search in question was motivated by a desire to harass or humiliate . . . ."); Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995) (per curiam). As Parkell does not point to any evidence of maliciousness, the search policy cannot serve as a basis for imposing Eighth Amendment liability on the defendants.

The only other evidence of the State Defendants' knowledge of the conditions that Parkell experienced are two letters signed by Phelps, informing Parkell of the results of his grievance appeals. But those particular letters refer to grievances (nos. 191813 and 192952) that deal only with Parkell's requests for further medical services, not relief from harsh conditions. Although the letters from Phelps could demonstrate Phelps's awareness of Parkell's medical complaints,[14] they do not demonstrate deliberate indifference, as Phelps is not medical staff. See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993) (non-medical defendants not deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor"); Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) ("[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.").

---

[14] Our oft-cited holding in Rode v. Dellarciprete, 845 F.2d 1195, 1208 (3d Cir. 1988) that the mere filing of a grievance does not show actual knowledge by a supervisor is not applicable, as Phelps's letters show that he actually had reviewed the grievances. Cf. Sutton v. Rasheed, 323 F.3d 236, 249-50 (3d Cir. 2003) (holding that an official who wrote back in response to a grievance had "played an active role" in a constitutional violation).

A grievance expressly challenging a practice of prohibiting medical personnel from interacting with an inmate might require intervention by non-medical staff, in that it would suggest that the inmate was not receiving care at all. But Parkell's grievances were different. Parkell wrote that he "complain[ed] often and mostly [was] ignored," described his symptoms, and asked for further treatments beyond what he was already receiving. App. 492. The written responses to those grievance show that the prison officials ensured that Parkell was under the care of medical personnel and being treated, and therefore that the officials were not deliberately indifferent. See Greeno v. Daley, 414 F.3d 645, 655-56 (7th Cir. 2005) ("Miller reviewed Greeno's complaints and verified with the medical officials that Greeno was receiving treatment. We do not think Miller's failure to take further action . . . can be viewed as deliberate indifference.").

Because there is insufficient evidence to find deliberate indifference on the part of any of the State Defendants, we will affirm the District Court's grant of summary judgment in the State Defendants' favor as to Parkell's Eighth Amendment conditions-of-confinement claim.

2.

We now turn to Parkell's Eighth Amendment medical-needs claim. To prove this claim, "evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003). The parties dispute only the issue of deliberate indifference, not whether Parkell had a serious medical need. The record would not permit a reasonable factfinder to conclude that the Medical Defendants were deliberately indifferent to Parkell's medical needs, and therefore we will affirm the District Court's grant of summary judgment in the Medical Defendants' favor as to this claim.

We have acknowledged that "prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67. A prisoner bringing a medical-needs claim "must show more than negligence; he

must show 'deliberate indifference' to a serious medical need."  <u>Id.</u>  "Allegations of medical malpractice are not sufficient to establish a Constitutional violation," nor is "[m]ere disagreement as to the proper medical treatment." <u>Spruill</u>, 372 F.3d at 235.  A "failure to provide adequate care . . . [that] was deliberate, and motivated by non-medical factors" is actionable under the Eighth Amendment, but "inadequate care [that] was a result of an error in medical judgment" is not.  <u>Durmer</u>, 991 F.2d at 69.  "We have found 'deliberate indifference' in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment."  <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999).

First, Parkell argues that Nurse Bryant violated his Eighth Amendment right to medical treatment during her encounter with him in January 2009.  Parkell attests that Bryant refused to let him speak to describe his symptoms, accused him of "run[ning] game" to obtain Vicodin, declared that she was not "fall[ing] for it," told him he could purchase aspirin himself, and instructed prison officers to "get him out of here."  App. 96, 178.  If Bryant had ignored Parkell's medical needs, her brusqueness might suggest that she did so deliberately and for non-medical reasons.  But Bryant did not ignore his needs.  Parkell claims that Bryant never properly examined his injury in person even though he had a "massive infection" and that she should have given him medication for pain.  App. 96, 178.  But there is no dispute that the most serious complications of Parkell's injury (including the visible releasing of pus) had not yet appeared when he saw Bryant.  There is also no dispute that Bryant ordered an x-ray that showed normal results.  And there is nothing in the record suggesting that, at the time that Parkell saw Bryant, it was improper to recommend over-the-counter pain medication rather than to seek a prescription from a doctor.  Particularly in light of the normal x-ray results, a factfinder could not reasonably conclude that Bryant deliberately ignored risks to Parkell's health.

Second, Parkell argues that CMS and CCS deprived him of needed medical care, in violation of the Eighth Amendment, in two respects: (1) Parkell was twice (first in August 2009 on CMS's watch, then again in March 2011 on CCS's watch) prescribed regular physical therapy but was only provided with limited, sporadic therapy, and his injury was exacerbated as a result; (2) Parkell was prescribed pain medication in March 2011, but CCS provided only half the prescribed dosage and, on some occasions, even less. Again, the contested issue is deliberate indifference — that is, whether "inadequate care was a result of an error in medical judgment" or "deliberate, and motivated by non-medical factors," Durmer, 991 F.2d at 69 — and Parkell fails to make a sufficient showing.

The deliberate indifference inquiry is complicated by the fact that CMS and CCS are institutional defendants. It is not enough for Parkell to show that a medical staffer was deliberately indifferent to his needs, because CMS and CCS "cannot be held responsible for the acts of [their] employees under a theory of respondeat superior or vicarious liability." Natale, 318 F.3d at 583. Parkell must impute that deliberate indifference to CMS and CCS by showing that they "turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights" such that they, as "policymaker[s,] can reasonably be said to have been deliberately indifferent to the need." Id. at 584 (quotation marks omitted). Parkell has not brought claims against specific CMS or CCS employees other than Bryant. But in order to succeed in his claim against CMS and CCS for violating the Eighth Amendment, Parkell need not name particular CMS or CCS employees who were deliberately indifferent, as long as a factfinder could conclude that some CMS or CCS employee was deliberately indifferent and the deliberate indifference can be attributed to CMS or CCS. See id. at 583 n.8.

As to the failure to provide prescribed physical therapy, Parkell argues that there was no medical reason to deny him therapy and the true reason was that, as a general practice, therapy for SHU inmates was often skipped because the prison lacked enough staff to transport them from the SHU or were unable to transport them when certain security

events occurred.[15]  CMS and CCS do not deny this but rather argue that they are not liable because the alleged logistical difficulties that undermined Parkell's therapy were indisputably caused by the DOC, which is the relevant "policymaker" in that arena, not CMS and CCS.  See Natale, 318 F.3d at 584.

We agree with CMS and CCS.  Systemic logistical constraints such as understaffing, which are unrelated to medical judgment, will typically not excuse failure to provide adequate medical care.  See Inmates of Allegheny Cty. Jail v. Pierce, 612 F.2d 754, 763 (3d Cir. 1979) (holding that deliberate indifference is shown "where the size of the medical staff at a prison in relation to the number of inmates having serious health problems constitutes an effective denial of access to diagnosis and treatment").  But there is a difference between actors who are actually responsible for those logistical constraints (or capable of remedying them) and actors who are not.  In Pierce, it was the jail administration, not the individual medical providers, that was responsible for the understaffing and deliberately indifferent to its effects.  See id. at 762-63; see also Byrd v. Shannon, 715 F.3d 117, 127-28 (3d Cir. 2013) ("[Byrd] has not shown that the delays in supplying his eye drops were due to deliberate indifference. . . .  Under Byrd's self-medication program, he is responsible for the renewal of his prescriptions, and thus, he was responsible for this delay. Other delays were caused by the pharmacy that provided the eye drops.  Therefore, the District Court properly granted summary judgment to [prison healthcare officials].").  That the DOC's transportation practices caused SHU inmates to miss needed physical therapy does not mean that CMS or CCS was indifferent to the problem.  And even if they were indifferent, their indifference could not have been the cause of Parkell's inadequate therapy, as there is no evidence that CMS or CCS had control over inmate transportation.  While

---

[15] Parkell reportedly learned this from a conversation with his physical therapist, and it is unclear whether his statements would be admissible at a trial.  But CMS and CCS do not dispute Parkell's claims about the transportation difficulties; indeed, their defense relies on it.

Parkell could conceivably sue <u>DOC</u> officials in relation to the transportation practices, he has not done so.

Parkell's medical-needs claim also fails in relation to his pain medication prescription (which implicates only CCS). According to Parkell's version of events, which CCS disputes, he was initially prescribed four Vicodin per day by Dr. DuShuttle, an amount that he never received once he returned to VCC. He typically received only two Vicodin per day, and on three occasions (March 23, 2011, March 29, 2011, and April 6, 2011) doses were missed. Nurses told Parkell that CCS's medical director could modify prescription recommendations made by outside consulting doctors and that the missed doses were caused by a short-term shortage.

With regard to the halving of the dosage, there is insufficient evidence that it was done for non-medical reasons, as Parkell alleges. The record is essentially silent as to why CCS's medical director would have reduced Parkell's pain medication below the level recommended by an outside consulting doctor (assuming, of course, that this actually happened). There could be several legitimate medical reasons for doing so, including generalized professional disagreement about the appropriate level of prescription pain medication for most patients. And a fact-finder could not reasonably reject those explanations in favor of an illegitimate explanation merely because Parkell claims to have heard other inmates say that "[the medical director] slash[es] in half everybody's order when you go out" to see a specialist, and to have heard Dr. DuShuttle say that "[t]hey cut my orders every time I make an order," App. 328 — even if those statements were admissible as evidence at trial.

As to the three missed doses, there is insufficient evidence that CCS turned a blind eye to an inadequate practice happening on its watch. There is no evidence that shortages were a common or systemic problem. And there is no evidence that CCS leadership would have known about isolated shortages in time to intervene. Parkell filed a grievance on April 16, 2011, alluding vaguely to "lapses in medication occur[ring] randomly," App. 234, but even if that

was sufficient to put CCS on notice, all three of the alleged shortages predated the grievance.[16]

We will therefore affirm the District Court's grant of summary judgment in favor of the Medical Defendants in relation to Parkell's Eighth Amendment medical-needs claims.[17]

## IV.

Finally, we reject Parkell's argument that the District Court abused its discretion by denying him appointed counsel.

"Indigent civil litigants possess neither a constitutional nor a statutory right to appointed counsel." Montgomery v. Pinchak, 294 F.3d 492, 498 (3d Cir. 2002). Appointing counsel for an indigent civil litigant is "usually only granted upon a showing of special circumstances indicating the likelihood of substantial prejudice to him resulting, for example, from his probable inability without such assistance to present the facts and legal issues to the court in a complex

---

[16] Parkell also cites a "Memorandum of Agreement between the United States Department of Justice and the State of Delaware that resulted from a DOJ investigation of Delaware prison facilities, including [VCC]," but Parkell only seeks to use this as evidence that "CMS and the DOC" — not CCS, which entered the picture later — "were on notice regarding deficiencies in the medical care afforded to inmates." Parkell Br. 49-50. Parkell also fails to explain what "deficiencies" were actually noted in the Memorandum and how they would have put CMS "on notice" with regard to the specific issues in this lawsuit.

[17] We do not address CCS's argument that Parkell's claim is barred by his failure to exhaust administrative remedies. Aside from being unnecessary to our disposition of the case, the issue was forfeited because CCS did not raise this issue in its summary judgment motion in the District Court, and thus Parkell never had an opportunity to respond with evidence of exhaustion. Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002) ("[F]ailure to exhaust is an affirmative defense to be pleaded by the defendant.").

but arguably meritorious case." <u>Smith-Bey v. Petsock</u>, 741 F.2d 22, 26 (3d Cir. 1984) (emphasis added).

District courts have "broad discretion to determine whether appointment of counsel in a civil case would be appropriate." <u>Montgomery</u>, 294 F.3d at 498 (quotation marks omitted). First, the court "must assess whether the claimant's case has some arguable merit." <u>Id.</u> at 498-99. If there is arguable merit, then the court should consider a range of factors, including:

> 1. the plaintiff's ability to present his or her own case; 2. the difficulty of the particular legal issues; 3. the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue investigation; 4. the plaintiff's capacity to retain counsel on his or her own behalf; 5. the extent to which a case is likely to turn on credibility determinations, and; 6. whether the case will require testimony from expert witnesses.

<u>Id.</u> at 499. These factors are "not exhaustive, but should serve as a guidepost for the district courts." <u>Id.</u> (quotation marks omitted). The plaintiff's ability to present a case is "[p]erhaps the most significant" consideration and depends on factors such as "the plaintiff's education, literacy, prior work experience, and prior litigation experience." <u>Id.</u> at 501. We have noted that prisoners have the ability to "proceed with an investigation through interrogatories, document requests, and requests for admissions" but are unable to conduct depositions, which are sometimes necessary to building a case. <u>Id.</u> at 502-04.

Parkell's chief complaint is that appointed counsel could have more aggressively pursued documents when the defendants resisted his requests for DOC policies and prison log books. But Parkell did file motions to compel, along with copious discovery requests, which demonstrated a considerable ability to pursue discovery. His discovery efforts were at times unsuccessful, and an appointed attorney may well have done better. But that could be said of nearly

any pro se case and does not, on its own, lead us to believe that the District Court abused its discretion.

Parkell also cites the complexity of the case and the centrality of credibility determinations as grounds to appoint counsel. But the core legal issues in this case — deliberate indifference and the reasonableness of searches — are not so complex that a pro se litigant would be altogether unable to grasp them. Further, Parkell had significant litigation experience, and his filings (including significant motion practice) in the District Court were coherent and demonstrative of both literacy and basic knowledge of the mechanics of litigation. Witness credibility is indeed central to the case, but that suggests a need for appointed counsel during trial, not at the summary judgment phase, where credibility determinations are not made.

The District Court, therefore, acted within the bounds of its broad discretion to deny Parkell appointed counsel.

## V.

For the foregoing reasons, the judgment of the District Court will be affirmed in part and reversed in part. The judgment will be reversed as to Parkell's claim against the State Defendants for prospective injunctive relief under the Fourth Amendment, which will be remanded to the District Court for further proceedings consistent with this opinion. In all other respects, the judgment will be affirmed.